UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, GARAGE EMPLOYEES LOCAL
272 LABOR MANAGEMENT PENSION FUND,

                          Plaintiff,

             -against-

APPLE INC. et al.,

                        Defendants.

Case No. 1:23-cv-01867 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

On March 3, 2023, International Brotherhood of Teamsters, Garage Employees Local
272 Labor Management Pension Fund ("Plaintiff") commenced this action against Apple Inc.
("Apple"), Tim Cook ("Cook"), Art Levinson, James Bell, Al Gore, Alex Gorsky, Andrea
Jung, Monica Lozano, Ron Sugar, Sue Wagner, Luca Maestri, Kate Adams, Deirdre O'Brien,
and Jeff Williams (together with Apple and Cook, "Defendants").  ECF No. 1 (the
"Complaint" or "Compl.").  The Complaint alleges violations of the Securities Exchange Act
of 1934 (the "Exchange Act"), 15 U.S.C. § 78a *et seq.*, and several regulations promulgated
thereunder by the Securities and Exchange Commission (the "SEC").  Compl. ¶ 2.  Before the
Court is Defendants' motion to dismiss the Complaint.  ECF No. 52 ("Br.").  For the
following reasons, Defendants' motion is GRANTED.

**BACKGROUND**[1]

## I.   The Parties

Plaintiff has been a stockholder of Apple since May 2005.  Compl. ¶ 3.  Apple is a
California corporation that is traded on the NASDAQ stock market exchange under the

---

[1] Unless otherwise noted, the facts stated herein are taken from the Complaint and accepted as
true for the purposes of resolving Defendants' motion to dismiss, as well as from documents

symbol AAPL.  *Id.* ¶ 4.  Cook is Apple's principal executive officer and chief executive

officer, and a member of Apple's board of directors (the "Board").  *Id.* ¶ 5.  Along with Cook,

Defendants Art Levinson, James Bell, Al Gore, Alex Gorsky, Andrea Jung, Monica Lozano,

Ron Sugar, and Sue Wager are members of the Board.   ECF No. 51-3 (the "2023 Proxy

Statement") at 12.  Luca Maestri, Kate Adams, Deirdre O'Brien, and Jeff Williams are

independent officers of Apple (together with Cook, the "NEOs").  *Id.* at 39.

## II.    Apple's 2023 Proxy Statement

On January 12, 2023, Apple filed its proxy statement for the March 10, 2023

shareholder meeting.  *Id.* ¶ 11; *see* 2023 Proxy Statement.[2]  The 2023 Proxy Statement

included disclosures regarding the advisory, non-binding "Say-on-Pay" vote on executive

compensation (the "Compensation Proposal") and a proposal for the reelection of Apple's

directors (the "Election Proposal").  Compl. ¶ 11; 2023 Proxy Statement.

The Board delegated to its Compensation Committee, comprised of Andrea Jung, Al

Gore, and Art Levinson, the authority to "review and approve the compensation of Apple's

named executive officers prior to the start of each fiscal year."  2023 Proxy Statement at 20,

42, 56.  Apple executives receive equity compensation in the form of restricted stock units

---

attached to or otherwise incorporated into the Complaint.  *See DiFolco v. MSNBC Cable LLC*,
622 F.3d 104, 110-11 (2d Cir. 2010); *Rubenstein v. Int'l Value Advisers, LLC*, 363 F. Supp.
3d 379, 383 & n.2 (S.D.N.Y. 2019) (considering Schedule 13Ds referenced in the complaint),
*aff'd*, 959 F.3d 541 (2d Cir. 2020).  Accordingly, Defendants' unopposed request for
consideration of ECF No. 53 (Exhibit A to their motion, which is Apple's 2023 Proxy
Statement) is granted.  *See* ECF No. 54.

[2] The 2023 Proxy Statement is publicly available on the SEC's website.  *See* Apple Inc.,
Proxy Statement (Form DEF 14A) (Jan. 12, 2023), https://www.sec.gov/Archives/edgar/data/
320193/000130817923000019/laap2023_def14a.htm [https://perma.cc/CJ3L-LFV2].
Although the Complaint and this opinion refer to Apple's proxy statements from previous
years, Plaintiff in this action only raises claims based on the 2023 Proxy Statement.  *See*
Compl. ¶¶ 29, 31.

("RSUs"), which are a right to receive shares of Apple stock in the future if certain conditions are met. *Id.* at 52, 54, 66. RSUs do not have monetary value unless the RSUs vest and shares are issued. *See id.*; *see also* ECF No. 57 ("Opp.") at 11 n. 5 ("These RSUs are . . . like options, where the value or cost depends on the market price of the Apple stock and . . . other assumptions" (citation omitted)). The RSUs that Apple awards can vest in two ways: (1) time-based RSUs, which generally vest as long as the executive continues to provide services to Apple through a certain time in the future; and (2) performance-based RSUs, which vest only if Apple achieves certain performance milestones. 2023 Proxy Statement at 52. Depending on Apple's performance based on total shareholder return relative to the S&P 500, Apple's performance-based RSUs may vest anywhere between 0% (in which case the executive would not receive any shares) and 200% (in which case the executive would receive about two shares for each performance-based RSU earned). *Id.*

According to the 2023 Proxy Statement, for Apple's NEOs other than Cook, the target equity compensation was $20 million per fiscal year, divided equally between time-based RSUs and performance-based RSUs. Compl. ¶ 16. For Cook, the 2023 Proxy Statement indicated that his target equity compensation for 2021 and 2022 was $75 million, divided equally between time-based RSUs and performance-based RSUs. *Id.* ¶ 17. The Compensation Committee lowered this target amount to $40 million for 2023, split 75% as performance-based compensation and 25% as time-based compensation. *Id.*

When determining compensation for Apple's executives, the Compensation Committee determines a target value of RSU-based compensation, as well as the split between time-based and performance-based RSUs. *Id.* at 46, 48, 52-53. The Compensation Committee then determines how many RSUs to grant, as reflected by the target value of RSUs awarded. *Id.* at 52-53. For fiscal year 2022, the target number of RSUs granted to each NEO

"was determined by dividing [the target value of the grant] by the closing stock price on the date of grant." *Id.*  The eventual monetary value of the RSUs is unknown at the time of the grant because the value depends on whether the RSUs vest and, if so, in what amount.

In the compensation tables,[3] the 2023 Proxy Statement disclosed the grant-date fair value (the "Accounting Value," that is, the estimate of the stock's accounting value as of the time it was granted) of the RSUs granted to the NEOs for fiscal years 2020, 2021, and 2022. *Id.* at 59, 61.  For the time-based RSUs for those years, Apple disclosed "[t]he grant date fair value . . . based on the closing price of Apple's common stock on the date of the grant." *Id.* at 61.  For the performance-based RSUs for those years, Apple disclosed the grant-date fair value as calculated using the Monte Carlo model.[4] *Id.* at 59, 61.  The 2023 Proxy Statement stated that the Accounting Value of the RSUs awarded and the target value of the RSUs "may differ based on the applicable data, assumptions, and estimates used in the [Monte Carlo] model." *Id.* at 59.

Putting these pieces together, the 2023 Proxy Statement stated that Apple intended to award the NEOs $77.5 million in performance-based compensation in each of 2021 and 2022,

---

[3] As described by Plaintiff, "[p]roxy statements often contain both (1) glossy, narrative sections that are filled with colorful charts and graphs and (2) muted gray-scale sections that are required by SEC rules and regulations . . . Here, the 2023 Proxy Statement's discussion of executive compensation is no exception."  Opp. at 4 n.2 (asking the Court to "[c]ompare pages 41-57 (narrative section of NEOs' compensation) to pages 58-67 (required disclosures concerning NEOs' compensation)").

[4] A Monte Carlo simulation is a sophisticated accounting model used to determine Accounting Value.  *See* Compl. ¶¶ 10, 19.  "A Monte Carlo simulation involves repeated random sampling of various potential scenarios to compute an average result.  The Monte Carlo method is especially useful for modeling phenomena with significant uncertainty in inputs and in studying systems with a large number of coupled degrees of freedom."  *Advanced Analytics, Inc. v. Citigroup Glob. Mkts., Inc.*, No. 04-cv-03531 (LTS) (HBP), 2019 WL 9466011, at *1 n.4 (S.D.N.Y. Sept. 4, 2019), *report and recommendation adopted*, 2021 WL 4478621 (S.D.N.Y. Sept. 30, 2021).

and that it intended to award them $70 million in performance-based compensation in 2023. Compl. ¶ 18.  As disclosed in Apple's 2023 Proxy Statements, when a Monte Carlo analysis is used to calculate the grant date fair value of the performance-based RSUs, the NEOs were awarded $92,685,830 in performance-based shares for 2021, and $94,021,780 for 2022.  *Id.* ¶ 19-20.[5]

### III.  Procedural History

On February 17, 2023, Plaintiff made a pre-suit demand to Apple's board of directors by letter from its attorneys.  Compl. Ex. 1.  On March 3, 2023, Plaintiff commenced this action.  *See* Compl.  Defendants moved to dismiss the Complaint on May 19, 2023.  *See* Br. Plaintiff opposed the motion to dismiss on July 3, 2023.  ECF No. 57 ("Opp.").  Defendants replied in further support of their motion on August 2, 2023.  ECF No. 60 ("Reply").  On August 8, 2023, Plaintiff filed a request for oral argument.  ECF No. 61.  On February 6, 2024, the Court heard oral argument on the motion.  ECF No. 63.

### LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court draws all reasonable inferences in the plaintiff's favor and accepts as true all non-conclusory allegations of fact.  *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021) (en banc); *see also Iqbal*, 556 U.S. at 678.  However, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely consistent with' a

---

[5] A Monte Carlo analysis for the 2023 performance-based shares does not exist in the record. *See* Compl. ¶ 22.

defendant's liability." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  "[T]he court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side."  *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).  Determining whether a complaint states a claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

In considering a motion to dismiss under Rule 12(b)(6), "district courts 'may review only a narrow universe of materials,' which includes 'facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, . . . matters of which judicial notice may be taken,' as well as 'document[s] not expressly incorporated by reference in the complaint [that are] nevertheless "integral" to the complaint.'"  *Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023) (citing *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016)) (brackets in original).  "Where a document is referenced in a complaint, the documents control and this Court need not accept as true the allegations in the . . . complaint."  *Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016) (quotation marks and citation omitted).

## DISCUSSION

Plaintiff brings three claims in this action.  Plaintiff's first claim is brought pursuant to Section 14(a) of the Exchange Act ("Section 14(a)"), 15 U.S.C. § 78n, and relates to the Election Proposal.  Compl. ¶¶ 24-27.  Plaintiff's second claim is brought pursuant to Section 14(a) and relates to the Compensation Proposal.  *Id.* ¶¶ 28-31.  Plaintiff's third claim is a derivative claim to recover excess compensation of the NEOs.  *Id.* ¶¶ 32-36.

At the core of the Complaint is Plaintiff's assertion that the amount of executive compensation disclosed in the compensation-narrative section of the 2023 Proxy Statement

understates the actual compensation as disclosed in the compensation-tables section of the 2023 Proxy Statement. *Id.* at ¶¶ 6-10; Opp. at 4-12. According to Plaintiff, "to accurately determine the grant date fair value of performance-based compensation that are based on [relative shareholder return], one needs to employ a somewhat complicated analytical derivative pricing model such as a Monte Carlo simulation. Here Apple did so for purposes of reporting the NEOs['] compensation in 2022 and 2023, but it failed to use such a model when awarding the performance-based RSUs." Compl. ¶ 10. As a result, Plaintiff contends, "the 2021-2022 compensation actually cost Apple $31,707,610 more than the amounts disclosed in the 2023 Proxy Statement, and . . . Apple's representations were materially false because they grossly understated the known costs of this compensation." Opp. at 1 (emphasis omitted); *see* Compl. ¶¶ 10, 20. Plaintiff further asserts that "Apple has done the same thing for its NEOs' 2023 compensation," because Apple has under-disclosed the intended compensation for the NEOs for 2023 by failing to disclose that compensation's Accounting Value. Opp. at 1-2.

The Court will examine the two Section 14(a) claims together and then address the derivative claim.

## I.   The Section 14(a) Claims

### A.   Applicable Law

#### i.    Section 14(a)

Section 14(a) of the Exchange Act makes it unlawful:

> for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

15 U.S.C. § 78n(a)(1).  "In passing Section 14(a), Congress sought to avoid a very particular harm – the solicitation of shareholder proxies without adequate disclosure.  The SEC rules promulgated under Section 14(a) are intended to level somewhat the playing field for proxy contestants and to force disclosures that promote informed shareholder voting."  *MONY Grp., Inc. v. Highfields Cap. Mgmt., L.P.*, 368 F.3d 138, 147-48 (2d Cir. 2004).

Rule 14a-9, promulgated under Section 14(a), prohibits proxy statements which are "false or misleading with respect to any material fact, or which omit[] to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a).  "A fact is material for purposes of Rule 14a-9 if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."  *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198 (2d Cir. 1993) (quotation marks and citation omitted).

"A private right of action under Rule 14a-9 is well established."  *Koppel v. 4987 Corp.*, 167 F.3d 125, 131 (2d Cir. 1999).  To state a claim under Section 14(a) and Rule 14a-9, a claimant must allege: "(1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 238 (S.D.N.Y. 2012) (citation omitted); *accord Rubenstein ex rel. Jefferies Fin. Grp. Inc. v. Adamany* ("*Rubenstein III*"), No. 20-cv-02775 (PAC), 2022 WL 6592503, at *3 (S.D.N.Y. Oct. 5, 2022) (articulating same standard), *aff'd*, No. 22-2794, 2023 WL 6119810 (2d Cir. Sept. 19, 2023) ("*Rubenstein IV*") (summary order).  Accordingly, "both loss causation and transaction causation must be proven . . . under § 14(a)."  *Grace v. Rosenstock*, 228 F.3d 40, 47 (2d Cir. 2000).

### ii.    Heightened Pleading Standard

The Private Securities Litigation Reform Act of 1995 (the "PSLRA") imposes additional pleading requirement to private rights of action brought under the Exchange Act. 15 US.C. § 78u-4(a).  The PSLRA requires that, in pleading a material misrepresentation or omission, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  Accordingly, a plaintiff "must do more than say that the statements were false and misleading; they must demonstrate with specificity why and how that is so."  *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 564 (S.D.N.Y. 2018) (ellipsis omitted) (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) (summary order).

Defendants argue that Plaintiff's Section 14(a) claims are subject to the PSLRA's heightened pleading standard.  Br. at 11, 17.  Plaintiff does not address this argument in its opposition, and Defendants' argument on this point is therefore unopposed.  *See generally* Opp.  Accordingly, the Court will apply the PSLRA's heightened pleading standard to Plaintiff's Section 14(a) claims.

### B.  Analysis

#### i.     The Compensation Proposal[6]

Count II of the Complaint alleges "a direct claim for relief against Defendants under Section 14(a) of the Exchange Act for acting in contravention of the 'rules and regulations' promulgated by the SEC" based on the Compensation Proposal.  Compl. ¶ 28.  Defendants argue that Plaintiff's allegations fail to fulfill Section 14(a)'s three requirements, that is, that the proxy statement "(1) . . . contained a material misrepresentation or omission, which (2) caused plaintiff[] injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  *Bricklayers*, 866 F. Supp. 2d at 238 (citation omitted).

The Court will first evaluate loss causation.  As explained by the Second Circuit, the Supreme Court has "held that loss causation in Section 14(a) cannot be based on non-binding, cosmetic shareholder votes."  *Rubenstein IV*, 2023 WL 6119810, at *2 (quotation marks omitted) (indirectly citing *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1105-06 (1991)). Here, the Compensation Proposal was a purely advisory nonbinding "Say-on-Pay" vote, and addressed compensation that had already been granted, as Plaintiff concedes.  *See* Opp. at 14-16; Compl. ¶ 11.

As Plaintiff acknowledges, *see* Opp. at 16, this case is like *Rubenstein III*.  In *Rubenstein III*, the plaintiff alleged that "inaccuracies and omissions in the relevant proxy statements caused shareholders like [plaintiff] to approve[] the compensation of the [officers], including [certain] perquisite[s]."  2022 WL 6592503, at *3 (second alteration in original;

---

[6] The Court considers Count II first, which relates to the Compensation Proposal, and then proceeds to consider Count I, which relates to the Election Proposal, because Plaintiff's claims regarding the Election Proposal depend on an analysis of the Compensation Proposal.

quotation marks omitted).  The "[p]laintiff thus claim[ed] he was deprived of his 'say-on-pay'

right under the Dodd-Frank Wall Street Reform and Consumer Protection Act."  *Id.*  Because

"the votes on executive compensation were advisory and thus not binding" on the company,

the *Rubenstein III* court held that "the statements could not have caused shareholders to

approve any executive compensation package (and thus suffer a loss) for one simple reason:

the outcome of the shareholder vote on the executive compensation packages had no actual

effect on those packages."  *Id.*  In so concluding, the court cited the concern articulated by the

Supreme Court in *Virginia Bankshares* that any causation theory based on a non-binding,

cosmetic vote would be "hazy," and the resolution would be "unreliable."  *Id.* (quoting *Va.*

*Bankshares*, 501 U.S. at 1105-06).

   After the parties' briefing for this motion was complete, the Second Circuit affirmed

*Rubenstein III*.  *See Rubenstein IV*, 2023 WL 6119810, at *2.  The Second Circuit explained

that the plaintiff's "'say-on-pay' theory challenges the loss of a statutory right to cast a

particular vote, not the corporate action that the vote is intended to influence."  *Id.* at *3.  In

affirming *Rubenstein III*, the Second Circuit also "note[d] that every federal court to address

this issue has similarly concluded that Section 14(a) claims based on 'say-on-pay' proxy

materials fail to adequately allege causation." *Id.* at *3 n.4 (collecting cases).[7]

---

[7] Plaintiff argues, *see* Opp. at 18-19, that *Wilson v. Great American Industries, Inc.*, 979 F.2d
924 (2d Cir. 1992), provides an exception to the rule articulated in *Virginia Bankshares*.  The
court in *Rubenstein III* dispensed with a similar argument, explaining that *Wilson* applied to
the loss of state-law remedies, which provided "substantive rights – including the right to cash
out – that extend well beyond casting a vote."  2022 WL 6592503, at *4.  Therefore,
"[e]xtending the exception for state appraisal rights recognized in *Wilson* to claims like
Plaintiff's would allow exceptions to swallow the rule that causation theories rooted in non-
binding votes are too speculative."  *Id.*  The Second Circuit affirmed, reasoning that a say-on-
pay vote differed from the "substantive state right . . . at issue in *Wilson*."  *Rubenstein IV*,
2023 WL 6119810, at *3.  For the same reasons, Plaintiff's argument is unavailing here.

At oral argument, Plaintiff argued that the Court should not consider *Rubenstein IV* because *Rubenstein IV* was a summary order, and therefore does not have binding precedential effect. *See Rubenstein IV*, 2023 WL 6119810. "But a district judge is not at liberty to disregard, let alone contradict, a Second Circuit ruling squarely on point merely because it was rendered in a summary order." *Accent Delight Int'l Ltd. v. Sotheby's*, 505 F. Supp. 3d 281, 286 n.3 (S.D.N.Y. 2020) (citation omitted). Thus, the Court will not break from the Second Circuit's guidance articulated in *Rubenstein IV*.

In its opposition brief, Plaintiff argues that the shareholder vote is not cosmetic because it is Apple's practice to consider the "Say-on-Pay" votes in considering future compensation. Opp. at 15-16. Even if this is Apple's practice, the Say-on-Pay vote embodied in the Compensation Proposal is still non-binding and advisory. Plaintiff's cause of action, based on the theory that had Apple calculated executive compensation with the Monte Carlo model and presented that calculation in the narrative section of the 2023 Proxy Statement, then shareholders would have voiced feedback that then would have caused Apple to change the executive's compensation, is impermissibly speculative. *See Rubenstein IV*, 2023 WL 6119810, at *3; *see also Koppel*, 167 F.3d at 137; *Va. Bankshares*, 501 U.S. at 1105-06. Plaintiff has therefore failed to plead loss causation.

The cases cited by Plaintiff are distinguishable. Plaintiff argues that in *Galef v. Alexander*, 615 F.2d 51 (2d Cir. 1980), "the Second Circuit held that economic harm is not an essential predicate for Section 14(a) loss causation," Opp. at 19. However, *Galef* concerned non-disclosure of *director* compensation. As the Second Circuit has noted, there is a link between non-disclosure of *director* compensation and director elections because of the potential for self-dealing. *See Rubenstein ex rel. Jefferies Fin. Grp. Inc. v. Adamany* ("*Rubenstein II*"), No. 21-905, 2021 WL 5782359, at *4 (2d Cir. 2021) (summary order).

12

This rationale is inapplicable here, given that Plaintiff challenges *officer* compensation.[8]  And in *Rubenstein II*, the Second Circuit explained that, in assessing loss causation on Plaintiff's claim related to director elections, the district court had relied only on non-binding and out of circuit authority, so it remanded to the district court for further consideration.  *Id.*  The Second Circuit concluded that "it is not clear – and we intimate no view on – whether Rubenstein has adequately alleged loss causation."  *Id.*  As explained above, even after the plaintiff was given the opportunity to amend his complaint, the Second Circuit in *Rubenstein IV* affirmed the district court's holding that the plaintiff had not adequately alleged loss causation.  2023 WL 6119810, at *3.

Even if Plaintiff had met the causation bar, the Court notes that Plaintiff fails to plausibly plead any actionable misrepresentations in the 2023 Proxy Statement.  Plaintiff does not allege any misstatement in the executive's compensation as disclosed in the 2023 Proxy Statement's compensation tables.  *See generally* Compl.; Opp.  Plaintiff also does not seek any relief based on any earlier proxy statements.[9]  *See id.*  Plaintiff alleges only that the method of calculation employed in the *narrative section* of the 2023 Proxy Statement, as opposed to the compensation tables that are also included, is "improper[]," Compl. ¶ 10, but

---

[8] As explained above, only Cook was both a director and NEO, and he did not sit on the Compensation Committee.  2023 Proxy Statement at 12, 39, 42.

[9] Any such challenges would also be time-barred.  *See Bond Opportunity Fund v. Unilab Corp.*, No. 99-cv-11074 (JSM), 2003 WL 21058251, at *12 (S.D.N.Y. May 9, 2003) ("The statute of limitations applicable to the § 14(a) claims is one year from discovery or three years from the occurrence that gives rise to the Complaint, whichever is less." (citing *Ceres Partners v. GEL Assocs.*, 918 F.2d 349, 362-63 (2d Cir. 1990))), *aff'd*, 87 F. App'x 772 (2d Cir. 2004); *Dekalb Cnty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 410 (2d Cir. 2016) ("[T]he same three-year statutes of repose that we applied to Section 14 in *Ceres* – which are the three-year statutes of repose that, until Congress passed [the Sarbanes-Oxley Act of 2002], applied to Sections 9(f) and 18(a) – still apply to Section 14(a) today.").

not that it was in any way inaccurate.  However, SEC filings such as the 2023 Proxy Statement must be read "as a whole," that is, "taken together and in context."  *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (quotation marks and citation omitted); *accord Rombach*, 355 F.3d at 172 n.7 ("The test for whether a statement is materially misleading under Section 10(b) . . . is whether the defendants' representations, taken together and in context, would have misled a reasonable investor." (quotation marks and citation omitted)).

As another court noted in a previous executive-compensation-related suit against Apple brought under Section 14(a), there is no SEC rule requiring that a specific method for determining executive compensation be used, so long as the chosen method is disclosed.  *See Greenlight Cap., L.P. v. Apple Inc.*, Nos. 13-cv-00900, 13-cv-00976 (RJS), 2013 WL 646547, at *11-13 (S.D.N.Y. Feb. 22, 2013).  That principle applies here.  The Complaint effectively admits (by pasting excerpts of Apple's disclosures in support of its claims) that Apple did precisely what Section 14(a) and SEC rules require – presented its compensation process and methods through detailed compensation tables.  *See* Compl. ¶ 19 ("[T]he proper way to determine the Grant Date Fair Values of performance-based equity compensation . . . is to use a sophisticated model such as a Monte Carlo simulation.  Apple used such a model when accounting for these performance-based shares as demonstrated by the Grants of Plan-Based Award Tables in its 2022 and 2023 Proxy Statements."); *cf.* 2023 Proxy Statement at 43-68.  Plaintiff does not allege that Apple was required to disclose anything more.  That the compensation tables are in gray type and not graphically designed in color like the narrative section is inconsequential.

14

In sum, Plaintiff has failed to plead loss causation based on the advisory nonbinding "Say-on-Pay" vote.[10]  Even if it had, Plaintiff has not adequately pleaded any misrepresentation in the 2023 Proxy Statement that was an "essential link" in affecting the proposed corporate action.  Accordingly, Count II of the Complaint is dismissed.

### ii.     The Election Proposal

Count I of the Complaint alleges a "direct claim for relief against Defendants under Section 14(a) of the Exchange Act for acting in contravention of the 'rules and regulations' prescribed by the SEC" based on the Election Proposal.  Compl. ¶ 24.  Defendants assert that Plaintiff's claim does not map onto any of Section 14(a)'s three required elements.  Br. at 21-22.  In opposition, Plaintiff argues that if "the Apple 2023 Proxy Statement [had] accurately disclosed the costs of the NEOs' compensation, instead of disclosing a 'target value' that understated these costs by millions of dollars and is meaningless, stockholders would have reconsidered their vote for the directors who awarded this compensation."  Opp. at 20.

The Complaint contains a single sentence about the election proposal: "Because the 2023 Proxy Statement solicits action to be taken at the meeting for the election of directors, SEC Schedule 14A (Item 8(a)) requires the 2023 Proxy Statement to furnish the information required by SEC Reg. S-K (Item 402) concerning Director and Executive Compensation."

---

[10] Plaintiff also cites *Greenlight Capital* for the proposition that "a 'say-on-pay' vote can give rise to a private right of action."  Opp. at 19.  This argument fails.  First, the *Greenlight* decision was rendered before the Second Circuit spoke in *Rubenstein IV*.  Second, the *Greenlight* court dismissed the plaintiff's say-on-pay claim on the basis that the claim of non-disclosure there was "entirely without basis," because the plaintiff failed to "point[] to any additional information Apple was *required* to release . . . nor d[id] [it] identify any material omissions."  *Greenlight*, 2013 WL 646547, at *12-13.  Therefore, the *Greenlight* court did not hold that the say-on-pay vote at issue there sufficed to state a claim.

Compl. ¶ 15.  This single statement fails to allege that the Election Proposal was an essential link to any corporate action or the cause of any alleged harm.

In opposition, Plaintiff argues that "the Second Circuit has not had . . . difficulty" "connect[ing] a director vote to the disclosures" like those at issue here.  Opp. at 19 (citing *Rubenstein II*, 2021 WL 5782359, at *3); *see Rubenstein II*, 2021 WL 5782359, at *3 ("Drawing all reasonable inferences in Rubenstein's favor, we understand his complaint to allege that, had the proxy statement accurately portrayed the cost of the abuse of the [relevant perquisites], Jefferies's board would have lost reelection, which would have had the result of ending or reducing the practice of excessive personal travel on company airplanes.").  This comparison is unavailing.  In *Rubenstein II*, the Second Circuit did not hold that the district court had erred in its ultimate conclusion to dismiss the complaint.  Rather, the Second Circuit explicitly "vacate[d] the decision of the District Court not because we have determined that it was wrong – we express no view on that question – but because it was reached without consideration of controlling precedent."  2021 WL 5782359, at *3.  The Court then instructed the district court to consider binding precedents, upon remand, with respect to the plaintiff's Section 14(a) claims.  *See id.* at *4.

After the plaintiff in *Rubenstein* amended his complaint and the district court again dismissed his claim, the Second Circuit affirmed the dismissal because the plaintiff's "tainted election" theory failed to adequately allege loss causation.  *See Rubenstein IV*, 2023 WL 6119810, at *3-5.  In so holding, the Second Circuit reasoned that the plaintiff did not plausibly allege that any financial harm suffered by the company was caused by the allegedly misleading proxy statement, where the plaintiff alleged that the proxy statement failed to disclose "the payment of millions of dollars of improper and undisclosed perquisites" and "the payment of director compensation to the [d]irector [d]efendants who were elected on the

misleading proxy statements." *Id.* at *4 (first alteration in original).  The Second Circuit explained that the plaintiff's allegations were conclusory and insufficient to establish loss causation because the plaintiff "d[id] not allege that the directors would *not* have been re-elected had the [relevant costs] been accurately disclosed prior to the election.  Instead, [the plaintiff] simply argues that the causation requirement is satisfied because the directors were re-elected based on proxy statements issued in violation of Section 14(a)." *Id.* (footnote and quotation marks omitted).

Again, this case is similar to *Rubenstein IV*.  Here, as in *Rubenstein IV*, Plaintiff's single statement in the Complaint concerning the Election Proposal, *see* Compl. ¶ 15 (quoted above), does not allege that the Election Proposal was an essential link to any corporate action or the cause of any alleged harm.  Instead, Plaintiff appears to allege that the causation requirement must be satisfied based on proxy statements allegedly issued in violation of Section 14(a).  *See Rubenstein IV*, 2023 WL 6119810, at *4.

*Witchko v. Schorsh*, No. 15-cv-06043 (AKH), 2016 WL 3887289 (S.D.N.Y. June 9, 2016), is also instructive.  There, the plaintiffs alleged that there were misstatements in financial statements included in proxy-solicitation materials, and they pleaded that "[t]he reelection of [the] defendants was an essential causal link in their continued breaches of fiduciary duties." *Id.* at *7.  The court held that this pleading was too conclusory to allege an essential link between any alleged misstatements in the proxy materials and the election of the board of directors, and therefore it dismissed the complaint for failure to adequately allege loss causation.  *Id.*  The court stated that the "case appears to be 'another attempt to use § 14(a) and Rule 14a-9 as an avenue for access to the federal courts in order to redress alleged mismanagement or breach of fiduciary duty on the part of corporate executives.'" *Id.* (quoting *Maldonado v. Flynn*, 597 F.2d 789, 796 (2d Cir. 1979)); *see also In re Diamond Foods, Inc.*

*Derivative Litig.*, No. 11-cv-05692, 2012 WL 1945814, at *7 (N.D. Cal. May 29, 2012)

("[T]he re-election of directors who have allegedly mismanaged the company is insufficient to

meet the 'essential link' requirement of Section 14(a)."), *aff'd*, 575 F. App'x 716 (9th Cir.

2014).

      Finally, as explained above, Plaintiff does not explain why or how the accounting

value of *officer* compensation has any bearing on *director* elections.  Only Cook was both a

director and NEO, and he did not sit on the Compensation Committee.  2023 Proxy Statement

at 12, 39, 42.  Although some courts have noted a concern about the potential for self-dealing

with non-disclosure of director compensation and director elections, *see, e.g.*, *Galef*, 615 F.2d

at 65-66; *Rubenstein II*, 2021 WL 5782359, at *4, there is no similar concern articulated here,

where Plaintiff appears to allege that the directors would not have been re-elected if the

named executive officers' compensation was calculated differently.

      For these reasons, the Court finds that Plaintiff has not adequately alleged non-

speculative loss causation resulting from the potential re-election of the directors.  Plaintiff's

claim is therefore dismissed.

## II.    The Derivative Claim

      Defendants argue that Plaintiff does not adequately plead the derivative claim alleged

in Count III of the Complaint for two reasons: (1) Plaintiff does not meet the threshold

requirements of Rule 23.1; and (2) the Complaint does not plead the basic elements of a claim

for breach of fiduciary duty.  Br. at 23-25.  In opposition, Plaintiff argues that it met the

pleading requirements articulated in Rule 23 and that it adequately pleaded a breach of

fiduciary duty because it pleaded that the Compensation Committee failed to properly inform

itself.  Opp. at 24 n.9.

## A.  Rule 23.1 Standing

Rule 23.1 establishes the protocol for bringing a derivative suit in federal court.  It requires that a complaint "state with particularity . . . any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members [and] the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3).  In other words, a complaint must allege either that (1) Plaintiff made a demand but the Board improperly refused to take action; or (2) the demand was otherwise excused.  *Id.*; *see, e.g.*, *Samuel M. Feinberg Testamentary Tr. v. Carter*, 652 F. Supp. 1066, 1072 (S.D.N.Y. 1987).

Defendants contend that, because Plaintiff first sent a demand, it is precluded "from arguing demand would be futile," and "must thus allege that the demand was wrongfully refused."  Br. at 23-24.  Plaintiff does not counter this argument.  *See generally* Opp.  The Court agrees with Defendants' unopposed position.  Rule 23.1 requires that, because Plaintiff first made a demand upon the Board, Plaintiff must allege that the demand was wrongfully refused.

Defendants next assert that Plaintiff cannot allege facts showing that the demand was wrongfully refused because: (1) Plaintiff did not wait a reasonable time for a response to the letter before filing this lawsuit; and (2) Plaintiff failed to plead that the Board's failure to act on Plaintiff's demand was not a reasonable exercise of business judgment.  Br. at 24-25.  In opposition, Plaintiff argues that the Board's failure to take action may constitute a *de facto* refusal of that demand and that the Complaint alleges that the Board failed to properly inform itself.  Opp. at 23-24.

Plaintiff sent the demand letter on February 17, 2023, *see* Compl. ¶ 34; *id.*, Ex. 1, and filed this lawsuit 14 days later, on March 3, 2023, *see* Compl.  Plaintiff's demand letter did not provide a deadline to respond.  *See id.*, Ex. 1.

Plaintiff was required to allow the board a reasonable time to investigate and respond to the letter before filing suit.  *See Rich ex rel. Fuqi Int'l, Inc. v. Chong*, 66 A.3d 963, 976 (Del. Ch. 2013); *FLI Deep Marine LLC v. McKim*, No. 4138, 2009 WL 1204363, at *4 (Del. Ch. Apr. 21, 2009).  "[I]n deciding whether a committee completed its investigation in a reasonable amount of time, [the Court] must recognize that the 'amount of time needed for a response will vary in direct proportion to the complexity of the technological, quantitative, and legal issues raised by the demand.'"  *Charal Inv. Co. v. Rockefeller*, No. 14397, 1995 WL 684869, at *3 (Del. Ch. Nov. 7, 1995) (quoting *Allison ex rel. Gen. Motors Corp. v. Gen. Motors Corp.*, 604 F. Supp. 1106, 1117-18 (D. Del.), *aff'd*, 782 F.2d 1026 (3d Cir. 1985)).

In *FLI Deep Marine*, the plaintiffs made a demand on the board; the following day, the board convened a special committee to consider the demand.  2009 WL 1204363, at *1-2.  Three weeks later, before the special committee had taken any action, the plaintiffs brought a derivative lawsuit.  *Id.* at *2.  The defendants moved to dismiss the complaint or, in the alternative, stay the proceedings while the special committee continued to investigate the subject of the demand.  *Id.*  The Delaware Court of Chancery found that three weeks was not a reasonable time for the board to conduct an investigation, and therefore, the plaintiffs' demand was premature.  *Id.* at *4.  The court declined to stay the case and instead dismissed the action without prejudice.  *Id.*

Here, the Court finds that an arbitrary (and unknown to Defendants) 14-day deadline was not a "reasonable time" for the Board to investigate and respond to Plaintiff's demand letter.  According to Plaintiff, at minimum, "[a]ssessing the validity of [the demand] would

require . . . the Board to read the 2023 Proxy Statement, the Demand Letter and the Compensation Committee minutes concerning the NEO awards," determine whether compensation was excessive, and then determine the next actions to deal with any such excess compensation. *See* Opp. at 23. The Court is also persuaded by Defendants' argument that "it took Plaintiff five weeks after the 2023 Proxy Statement was published (and years after similar statements [about prior years, as] referenced in the Complaint, were originally published)" to determine that there was some allegedly excessive compensation and "send the [d]emand [letter] in the first place." Reply at 9. The Court therefore does not agree with Plaintiff's claim that "there was no complexity to the demand letter sent to the Board." Opp. at 22-23; *see also Charal*, 1995 WL 684869, at *1, *3 ("reasonable" time for Board to consider demand was at least six months); *Allison*, 604 F. Supp. at 1118 (two-and-a-half months insufficient time for board to consider demand); *cf. Rich*, 66 A.3d at 965, 979 (over two years was sufficient time to deem demand refused when board took no action on demand). In conclusion, the Court finds that Plaintiff did not provide Defendants with a reasonable time to respond to the demand, and therefore, Plaintiff has not met the pleading standards required by Rule 23.1.

## B. Wrongful Refusal and the Business-Judgment Rule

Even if the lapse of time were considered a *de facto* refusal of Plaintiff's demand,[11] the Court's holding would be the same. It is true that "[i]f . . . the board took no action at all" in

---

[11] After Plaintiff filed this case, Apple's board considered and refused Plaintiff's demand. The parties both agree that "the Court should not consider Apple's demand refusal [in deciding this motion to dismiss] since it is outside the corners of the Complaint." Opp. at 23 n.8; *accord* Br. at 24 n.10. The Court agrees and disregards Apple's demand refusal for the purposes of deciding this motion. Thus, Plaintiff's request for the Court to "permit limited discovery into the process by which Apple's board refused Plaintiff's demand and convert Defendants' motion into a motion for summary judgment," Opp. at 23 n.8, is denied.

response to a shareholder demand, such failure "can, in limited circumstances, constitute a de facto refusal of that demand." *Milliken v. Am. Realty Cap. Hosp. Advisors, LLC*, No. 18-cv-01757 (VEC), 2018 WL 3745669, at *7 (S.D.N.Y. Aug. 7, 2018).  "If . . . the board took no action at all in response to the demand, the plaintiff can succeed if he shows that the board's failure to act was 'wrongful,' an analysis that turns on the amount of time that the board had to respond to the demand in light of the demand's complexity." *Id.* at *7 n.11.  When "a board moves to dismiss a case after failing to act on a shareholder's demand, the plaintiff can proceed with the suit if he raises a reasonable doubt that the board's conduct was the product of good-faith business judgment." *Id.* at *7 (emphasis omitted).  When a defendant moves to dismiss the complaint (as opposed to moving for a stay pending an investigation), the Court "must balance the interests of the corporation in possibly meritorious litigation with the deference traditionally accorded corporate boards." *Id*.

"The business judgment rule presumes that the board made its decision on an informed basis, in good faith[,] and in the honest belief that the action taken was in the best interest of the company." *In re Merrill Lynch & Co., Inc. Sec., Deriv. & ERISA Litig.*, 773 F. Supp. 2d 330, 345 (S.D.N.Y. 2011) (quotation marks and citation omitted).  "To overcome this presumption, the plaintiff must plead 'sufficient facts to suggest that the board's decision was unreasonable or not made in good faith, in the context of all of the factors that the board had to consider.'" *Gould ex rel. Bank of Am. v. Moynihan*, 275 F. Supp. 3d 487, 495 (S.D.N.Y. 2017) (quoting *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 807 F.3d 502, 505 (2d Cir. 2015)).  "[A] plaintiff alleging wrongful refusal of a demand must plead facts supporting a plausible inference that the board's decision not to take action was a result of gross negligence, defined under Delaware law as 'conduct that constitutes reckless indifference or

actions that are without the bounds of reason.'"  *Espinoza*, 807 F.3d at 506 (quoting

*McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008)).

Defendants argue that "Plaintiff has not pled any Board failure to take the action

Plaintiff requested was not a reasonable exercise of business judgment."  Br. at 24.  In

opposition, Plaintiff argues that it alleged that "the Apple Compensation Committee failed to

properly inform itself of the costs to Apple of the compensation provided to the NEOs when

granting such compensation, and as a result the NEOs were provided more compensation than

intended."  Opp. at 24.

Plaintiff's argument fails.  In asserting that it alleged that "the Apple Compensation

Committee failed to properly inform itself of the costs of the compensation provided to the

NEOs when granting such compensation," Plaintiff conspicuously fails to cite to any such

allegation in the Complaint.  *See generally* Opp.; Compl.; *see Clanton v. UMG Recordings,

Inc.*, 556 F. Supp. 3d 322, 327 n.1 (S.D.N.Y. 2021) ("It is axiomatic that a complaint cannot

be amended by the briefs in opposition to a motion to dismiss." (brackets and citation

omitted)).

Moreover, as discussed above, the 2023 Proxy Statement includes detailed executive

compensation tables – notably, ones which Plaintiff has not pled are inadequate, deficient, or

misleading.  Here, Plaintiff's only argument in opposition to this motion is that "there is no

evidence that" Apple's directors "inform[ed] themselves as to all information that was

reasonably available to them," and that "[t]here is no indication that the Board informed itself

as to the costs to Apple of this compensation when granting it."  Opp. at 24-25.  But the

business-judgment rule instructs the Court to "presume[] that the board made its decision on

an informed basis, in good faith[,] and in the honest belief that the action was in the best

interests of the company."  *In re Merrill Lynch*, 773 F. Supp. 2d at 345 (quotation marks and

citation omitted).  Absent any plausible allegations to the contrary here, especially given the disclosures in the 2023 Proxy Statement, the Court assumes that the board adequately informed itself.

In sum, Plaintiff has not "plead[ed] 'sufficient facts to suggest that the board's decision was unreasonable or not made in good faith.'"  *Gould*, 275 F. Supp. 3d at 495 (quoting *Espinoza*, 807 F.3d at 505).  Accordingly, Plaintiff has failed to adequately plead a derivative claim.  Plaintiff's derivative claim is therefore dismissed.

## III.   Leave to Amend

Rule 15(a) provides that courts "should freely give leave [to amend] when justice so requires."  Nonetheless, "it is within the sound discretion of the district court to grant or deny leave to amend."  *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).  "[A] district court may properly deny leave when amendment would be futile."  *Jones v. N.Y. State Div. of Mil. & Naval Affs.*, 166 F.3d 45, 50 (2d Cir. 1999).

Plaintiff has not requested leave to amend in its papers nor during oral argument. Even if it had, to seek leave to amend, a plaintiff must at least "provide some indication of the substance of the contemplated amendment before a court could entertain the request."  *Mariah Re Ltd. v. Am. Fam. Mut. Ins. Co.*, 52 F. Supp. 3d 601, 624 (S.D.N.Y. 2014), *aff'd*, 607 F. App'x 123 (2d Cir. 2015) (summary order); *see TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be given leave to amend if it fails to specify . . . how amendment would cure the pleading deficiencies in its complaint.").  There is no indication here of how an amendment of the pleading could cure the flaws the Court has identified above.  Therefore, the Complaint is dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss with prejudice is

GRANTED.  The Clerk of Court is respectfully directed to terminate the motion pending at

ECF No. 51 and close the case.

Dated: February 7, 2024
       New York, New York

                               SO ORDERED.


                               _Jennifer Rochon_
                               JENNIFER L. ROCHON
                               United States District Judge